# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

---

**ARNOLD C. MUENZENBERGER**
           **Plaintiff,**

        **v.**                                    **Case No. 12-C-138**

**CAROLYN W. COLVIN,[1]**
**Acting Commissioner of the Social Security Administration**
              **Defendant.**

---

## DECISION AND ORDER

Plaintiff Arnold Muenzenberger applied for social security disability benefits, claiming that he could no longer work due to the residual effects of a traumatic brain injury.  The Social Security Administration ("SSA") denied his application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing.  The Appeals Council accepted review, modifying the basis for decision but nevertheless maintaining the denial.  Plaintiff now seeks judicial review of the denial under 42 U.S.C. § 405(g).

The court reviews the Commissioner's decision to deny an application for disability benefits to ensure that it is supported by "substantial evidence" and based on the correct legal standards.  Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011).  Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Pepper v. Colvin, 712 F.3d 351, 361-62 (7th Cir. 2013).  Under this deferential standard, the court may not re-weigh the evidence or substitute its judgment for the Commissioner's.  Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012).  If reasonable minds

---

[1]Carolyn Colvin is substituted as defendant pursuant to Fed. R. Civ. P. 25(d).

could differ over whether the claimant is disabled, the court must uphold the decision under review.  Id.

## I.  FACTS AND BACKGROUND

A.    **Medical Evidence**

On October 24, 2009, plaintiff got into an argument with his girlfriend's son, fell or was pushed down and struck his head on a cement floor, losing consciousness and displaying "seizure like activity."  (Tr. at 291.)  He was transported to the hospital, where a CT scan showed a left fronto-parietal skull fracture with an epidural bleed.  Because of progressive neurologic deterioration, he was immediately taken to surgery, with Dr. Michael Ebersold performing a craniotomy with evacuation of the epidural hematoma.  (Tr. at 318, 348-49.)

Plaintiff did well post-operatively but developed significant post-concussive headaches, and testing revealed evidence of cognitive disorder secondary to traumatic brain injury, mild to moderate in severity, and on October 29, 2009, he was admitted for in-patient rehabilitation services.  (Tr. at 288-89, 291-93, 328.)  He made significant improvement, completing most personal care activities with complete independence, and discharged home on November 9, 2009 to follow-up with Dr. Mark Stevens, a neurosurgeon, Dr. Linda Dunaway, a neuropsychologist, and Dr. Susan Halter, a physical medicine and rehabilitation physician.  (Tr. at 293-312.)   Dr. Dunaway restricted him from work or driving but expected him to make cognitive gains with further neurologic recovery.  (Tr. at 328.)

On November 16, 2009, Dr. Stevens noted no evidence of bleeding on a repeat CT scan.  Neurological exam showed some mild drift to the right, although not bad.  Plaintiff's speech was "not too bad as well."  (Tr. at 374.)  Plaintiff's biggest issue was endurance, for

which he needed more physical therapy in time.  He was not then physically or mentally able to return to work.  Dr. Stevens explained that "it is a matter of time in order to see if he will get better."  (Tr. at 374.)  No further surgery was necessary.  Dr. Stevens indicated that plaintiff could drive short distances and provided Halcion to help with sleep.  He also recommended continued physical therapy to address endurance and balance deficits, and follow up with neuropsychology in one month to determine cognitive losses and what additional treatment would be necessary.  (Tr. at 369, 374-75, 546.)  On November 24, Stephanie O'Bryant, FNP, provided Naproxen for headaches and low back pain.  (Tr. at 419, 619.)  By November 30, therapy notes indicated that plaintiff's balance was much improved, and he continued to work on conditioning.  (Tr. at 380.)

Plaintiff saw Dr. Halter on December 8, 2009, complaining of daily headaches, for which he took Tylenol.  He indicated that the headaches worsened with noise or activity, and he was not yet ready to return to work. (Tr. at 369.)  Plaintiff appeared somewhat disorganized but overall his memory appeared fairly good.  He was able to ambulate without assistance but could not tandem walk without a cane due to loss of balance.  He was to continue physical therapy, remain off work, and take Tylenol for headaches as needed.  (Tr. at 370.)

On December 14, 2009, plaintiff returned to Dr. Stevens, who noted that plaintiff had made a very good recovery but still felt fatigued, with significant headaches, and memory problems.  Dr. Stevens could not say for sure if the headaches would persist; with a significant head injury, headaches can remain a significant problem for the rest of the patient's life.  No further neurosurgical care was required, and Dr. Stevens referred plaintiff to medical neurology to manage headaches and other post-concussive symptoms. (Tr. at 372, 541.)

On December 18, 2009, plaintiff saw neurologist Dr. Pat Bryant, on referral from Dr.

3

Stevens, complaining of daily headaches.  (Tr. at 533.)  Dr. Bryant found the headaches consistent with post-traumatic headaches and recommended a trial of Neurontin.  (Tr. at 535.)

On January 18, 2010, plaintiff saw Dr. Charles Nolte for shoulder pain.  X-rays were essentially normal, aside from some mild degenerative changes at the AC joint.  (Tr. at 364, 386, 387.)  Dr. Nolte diagnosed adhesive capsulitis of the left shoulder secondary to trauma and AC joint grade 3 sprain, recommending physical therapy.  (Tr. at 364; 410-11.)  Plaintiff also saw Dr. Bryant on January 18, indicating that the Neurontin was helping his headaches. He complained of occasional dizziness but otherwise no side effects.  Dr. Bryant continued Neurontin.  (Tr. at 362.)

On February 2, 2010, plaintiff underwent a neuropsychological evaluation with Dr. Dunaway to assess cognitive recovery since his hospitalization.  Dr. Dunaway noted that results of a neuropsychological evaluation conducted during the hospitalization revealed diffuse cortical compromise, greater on the left and in the bifrontal regions, the pattern of which appeared most consistent with the type of head injury plaintiff sustained and met the criteria for cognitive disorder, secondary to traumatic brain injury, mild to moderate in severity.  (Tr. at 451.)  Following his discharge, plaintiff reported disturbed sleep, poor motivation, declined sense of taste, and photosensitivity and phonosensitivity.  He further reported poor recall of newly learned information and word retrieval, episodic dizziness, and being easily cognitively overwhelmed.  He also reported fatigue, mild swaying when walking, and episodic tingling and numbness in his fingertips.  (Tr. at 452.)  On observation, Dr. Dunaway found plaintiff alert, well oriented, and displaying overtly adequate cognitive, behavioral, and emotional stability for the purpose of completing the evaluation.  He appeared to be a reliable historian and remained motivated during testing, leading Dr. Dunaway to conclude that the results represented a valid

4

reflection of his current level of functioning.  (Tr. at 453.)  The results revealed statistically significant improvements in complex verbal learning and retrieval memory, information processing speed and visual scanning, word retrieval, visuoperception, and dominant right hand fine motor speed, and, to a lesser extent, in mental flexibility and phonemic fluency compared to the results on October 28, 2009.  Thus, Dr. Dunaway concluded that plaintiff had demonstrated good cognitive recovery along generally expected time lines, and his profile now met the criteria for cognitive disorder, secondary to traumatic brain injury, mild severity.  She expected him to demonstrate even further gains with further neurologic recovery.  However, he still had diffuse, mild range cognitive declines to the point that a return to work was premature at that time.  He was encouraged to return in three months to assess further gains and revisit his capacity to return to work.  He was permitted to return to driving in a restricted manner.  He endorsed depression, and Dr. Dunaway suggested a trial of SSRI medication. (Tr. at 454.)   On February 11, FNP O'Bryant started plaintiff on Zoloft based on the recommendation of Dr. Dunaway.  (Tr. at 406, 601.)

On February 22, 2010, plaintiff saw Dr. Halter for follow up.  Since his discharge from the hospital, he had been working in out-patient physical therapy on balance, gait, and motion sensitivity, making nice improvement but continuing to have some bothersome problems, including balance problems and being bothered by loud noises.  He reported that the Zoloft had been helpful in improving his mood.  On exam, he displayed mild discomfort in the lumbar paraspinal region. (Tr. at 366.) Dr. Halter recommended cognitive therapy; continued physical therapy to improve gait, balance, and motion sensitivity; and continued therapy for shoulder pain.  Plaintiff was not then ready to return to competitive employment; he was to follow up with Dr. Dunaway in May 2010 for follow up cognitive testing and further recommendations at that

time.  Dr. Halter noted: "He is planning to apply for Social Security and this is appropriate as he will likely be disabled for his previous level of employment for at least a year from the time of injury.  He may eventually require the services of DVR."  (Tr. at 367.)

On February 24, 2010, plaintiff returned to Dr. Bryant, indicating that the Neurontin was helping, now not as much.  Dr. Bryant increased the Neurontin dose.  (Tr. at 360.)

On March 8, 2010, plaintiff underwent a speech-language/cognitive-linguistic evaluation, which indicated that he had made gains in most areas of functioning since his hospitalization. He was then functioning in the normal to mild range with only thought organization continuing to fall in the moderate range of impairment; previously, his scores placed him in the mild to moderate range.  It was recommended that he complete cognitive-linguistic therapy with emphasis on thought organization and mental agility tasks.  (Tr. at 392, 596.)

On March 25, 2010, plaintiff saw Dr. Bryant for follow up of his post-traumatic headaches.  Plaintiff did not feel the Neurontin was helping, so Dr. Bryant started Amitriptyline, with decrease of Neurontin.  (Tr. at 358, 471.)  On April 29, plaintiff advised Dr. Bryant that his headaches were the same.  Dr, Bryant suspected possible post-traumatic stress disorder ("PTSD") based on plaintiff's reported fear of crowds and trouble sleeping, recommending that he be seen by psychiatry.  (Tr. at 469.)

On May 10, 2010, plaintiff saw FNP O'Bryant for knee pain and PTSD.  She diagnosed right knee pain and crepitus.  X-rays were negative.  (Tr. at 486, 488, 584, 586.)  She advised him to take Ibuprofen.  For PTSD, she increased Zoloft.  (Tr. at 486, 584.)

On May 11, 2010, plaintiff returned to Dr. Dunaway for a repeat neuropsychological evaluation.  Since last seen, plaintiff reported continued anxiety, periodic disorientation in the dark, periodic confusion about how to use lawn tools, insomnia, trouble managing his

6

checkbook, fatigue, and difficulty with sustained concentration.  He reported that the Zoloft helped his mood but not his memory.  On observation, he displayed overtly adequate cognitive, behavioral, and emotional stability for purposes of completing the evaluation.  (Tr. at 464.)  He appeared to be a reliable historian, however, he also endorsed an unusually high number of symptoms that were atypical in patients with known or suspected cognitive or psychiatric symptoms.  His score was significantly elevated above the recommended cutoff score, placing him in the suspected range for intention to exaggerate or feign symptoms for the purpose of internal or external secondary gains.  In addition, his performance pattern on memory measures was suggestive of knowing attempts to inflate his error rate in an effort to appear more cognitively compromised that he truly was.  Since the remainder of his performance appeared valid, those measures on which his intention was questionable were eliminated from diagnostic consideration.  The results revealed statistically significant improvements from either his initial or former test results in executive skills, facets of language, and visuoperception, and, to a lesser degree, in reasoning and attention to detail.  He maintained mild cognitive inefficiencies only in simple auditory attention and sustained complex verbal output.  However, these inefficiencies were not of sufficient severity to be termed impairments, and their pattern was most consistent with very mild vacillating attention, likely secondary to stress.  Dr. Dunaway concluded: "This is a normal neurocognitive profile that reveals a return to baseline levels of function in all domains in this individual.  [Plaintiff] displays a full cognitive recovery, remains competent, is not precluded from any of his historic activities and is no longer disabled from a neurocognitive standpoint. . . . He may return to full-time gainful employment and unrestricted driving at this time."  (Tr. at 465.)

On June 7, 2010, plaintiff saw FNP O'Bryant, noting continued issues with temper but

7

with symptoms improving on Zoloft.  Plaintiff asked for a handicapped parking sticker, but FNP O'Bryant declined, stating: "I discussed with him that I think he is doing quite well and does not really qualify for this anymore.  He tells me that his short term memory still does not seem to be where it usually was, and he does not believe his physical capabilities are back to normal or back to how he was prior to the injury." (Tr. at 579.)  However, he answered questions appropriately, and demonstrated good insight and judgment.  She increased his Zoloft. (Tr. at 579.)  On June 28, FNP O'Bryant noted that plaintiff was doing well on medication, with no side effects.  He continued to have headaches and was scheduled to be seen at the Mayo Clinic in September. (Tr. at 577.)

The June 30, 2010, discharge report from cognitive-linguistic therapy indicated that plaintiff's prognosis was considered fair to good for return to prior level of function if anxiety and headache issues could be resolved.  (Tr. at 590.)  The report indicated that anxiety and stress from life circumstances likely contributed to plaintiff's impairments from the traumatic brain injury.  (Tr. at 590-91.)  The report stated: "Hypersensitivity to background noise is a fairly common phenomena of traumatic brain injured individuals, and I would have doubts that the patient would be able to work at this point, in a noisy environment, but should be employable in some capacity given his mostly mild-moderate cognitive-linguistic impairments." (Tr. at 591.)

On July 19, 2010, FNP O'Bryant noted that plaintiff had been doing well on Zoloft but now reported nightmares so she switched him to Celexa.  (Tr. at 562-63.)  On August 2, she noted him to be doing well on the new medication; she also provided Halcion for sleep.  (Tr. at 558.)  On August 23, FNP O'Bryant indicated that plaintiff reported getting upset easily despite an increased dose of Celexa. He also continued to have regular headaches, as well as back pain for which he saw a chiropractor.  FNP O'Bryant told him to keep a headache diary

8

(Tr. at 556), provided Naproxen for headache and back pain, and increased Celexa for PTSD. (Tr. at 557.)

On September 13, 2010, plaintiff saw Dr. Ivan Garza at the Mayo Clinic for his persistent headaches. (Tr. at 651.) On physical exam, plaintiff displayed give-way and collapsing weakness in every single movement tested. (Tr. at 655.) Dr. Garza suggested an increased Amitriptyline dose and possibly an increase in Gabapentin. He also suggested that plaintiff consider the Brain Rehabilitation Program. (Tr. at 656.) On October 12, Dr. Jeffrey Thompson of the Brain Rehabilitation Program provided a consult (Tr. at 651), suggesting that plaintiff see a neuropsychologist as well as cognitive rehab specialist (Tr. at 653).

On November 22, 2010, plaintiff saw Dr. Halter for the primary purpose of completing a form for his disability claim. Plaintiff complained of non-restorative sleep, short term memory problems, and continuing dizziness. (Tr. at 682.) Dr. Halter completed the form on plaintiff's behalf in his presence. He was to return for follow up as needed. (Tr. at 683.)

In the November 22, 2010, "multiple impairment questionnaire," Dr. Halter listed diagnoses of traumatic brain injury, status post craniotomy, cognitive impairment, and impaired balance, with a guarded prognosis. As clinical findings, she cited the CT scan demonstrating hematoma and skull fracture. (Tr. at 660.) As symptoms, she listed fatigue, headaches, impaired balance, impaired judgment and decision-making, and blurry vision. (Tr. at 661.) She rated plaintiff's pain at between 2 and 8 on a 0-10 scale, and his fatigue at 5 on a 0-10 scale. Dr. Halter indicated that plaintiff could sit 3 to 4 hours and stand/walk 2 hours in an 8 hour day. He could not sit continuously and had to get up and move around every 15 minutes. (Tr. at 662.) He could frequently lift/carry 0-5 pounds, occasionally 5-10 and 10-20 pounds, but never more. Dr. Halter further endorsed significant limitations in repetitive reaching, handling, and

9

fingering, indicating that plaintiff needed to move and change position frequently and had decreased attention span.  (Tr. at 663.)  His pain, fatigue, and other symptoms were severe enough to constantly interfere with attention and concentration, and he was incapable of even low stress work.  (Tr. at 665.)  Finally, plaintiff required unscheduled breaks every 15-30 minutes during an 8-hour workday and would be absent more than three times per month due to his impairments.  (Tr. at 665-66.)

The SSA, through the state agency, also arranged for plaintiff's application to be evaluated by two consultants.  On June 11, 2010, Dr. Robert Callear completed a physical residual functional capacity ("RFC") assessment report, finding plaintiff capable of medium work, with limited climbing of ladders, ropes or scaffolds, and no concentrated exposure to hazards due to balance difficulties.  (Tr. at 506-13.)  On June 14, 2010, Jack Spear, PhD, completed a psychiatric review technique form ("PRTF") evaluating plaintiff under Listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), and 12.06 (Anxiety-Related Disorders.  Under the "B criteria" of the Listing, Dr. Spear found mild restriction of activities of daily living; mild difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence, and pace; with one or two episodes of decompensation.  (Tr. at 518-28.)  Dr. Spear concluded that plaintiff could sustain the basic mental demands of unskilled work with moderate restrictions in concentration, persistence, and pace.  (Tr. at 516, 530.)

## B.    Hearing Testimony

At his hearing before the ALJ, plaintiff testified that he was forty-two years old, with a high school education.  (Tr. at 37.)  He indicated that he had not worked since October 24, 2009, when he suffered a brain injury after being slammed head first into a concrete floor.  (Tr. at 37-38.)  Prior to his injury, he worked as a facilitator on a factory assembly line, a delivery

driver, a dump truck driver, and a factory worker.  (Tr. at 38-39.)  Plaintiff testified that after the injury he suffered from headaches, dizziness, and vision trouble, which prevented him from returning to work.  (Tr. at 39.)  He stated that the dizziness would come and go, but he experienced headaches daily.  (Tr. at 40-41.)  He took Gabapentin and Amitriptyline for the headaches.  (Tr. at 41.)  The Gabapentin would ease the pain after about an hour.  (Tr. at 48.) Almost every day he experienced headaches severe enough that he had to stop what he was doing and lie down.  (Tr. at 41-42.)  Plaintiff testified that the injury also led to short-term memory problems.  (Tr. at 42-43.)  He indicated that he could not return to his previous job at the factory due to the noise and fast pace.  (Tr. at 43.)  Plaintiff testified that he was still able to drive and run errands, although he needed to take a list to remember what he was going for; he also mowed the lawn and shoveled snow but with frequent breaks due to fatigue and headaches.  (Tr. at 45-46.)   The ALJ asked plaintiff about Dr. Dunaway's May 2010 neuropsychological evaluation, which suggested that plaintiff was malingering, but plaintiff denied exaggerating his symptoms during the evaluation.  (Tr. at 44.)

The ALJ also summoned a vocational expert ("VE") to the hearing.  The VE classified plaintiff's past work as a delivery driver as light, semi-skilled work; dump truck driver as light, semi-skilled; assembly material handler as medium, unskilled; and facilitator as medium/light, semi-skilled.  (Tr. at 51.)  The ALJ then posed a hypothetical question, assuming a person of plaintiff's age, education, and work experience, capable of light work, in a non-noisy environment, with no working at heights or around hazards, involving simple, repetitive, two to three step tasks, and not requiring a rapid pace.  (Tr. at 52.)  The VE responded that such a person could perform plaintiff's past work as a dump truck driver.  (Tr. at 52.)  After the ALJ clarified that he was limiting the person to unskilled, simple work, and noted that, because of

11

confusion, driving might not be appropriate, the VE testified that the person could work as a mail clerk, laundry worker, or gate attendant.  (Tr. at 53.)  On questions from plaintiff's representative, the VE testified if a person were absent more than three times per month, no work could be sustained.  Likewise, if the person required extra breaks due to headaches or chronic pain, no jobs would be available.  (Tr. at 54.)  Finally, if the person were distracted 15-20% of the day due to headaches, employment could not be maintained.  (Tr. at 55.)

## C.    ALJ's Decision

On April 11, 2011, the ALJ issued an unfavorable decision.  (Tr. at 87.)  Following the familiar five-step process, the ALJ found that plaintiff had not worked since October 24, 2009, the alleged onset date (step one), and that he suffered from the severe impairments of status post-traumatic brain injury with residual headache; post-traumatic stress syndrome; and mild chronic back pain (step two).  The ALJ noted that plaintiff had been diagnosed with Marfan Syndrome, but the record contained no confirmatory testing or other evidence of limitations from this diagnosis.  (Tr. at 92.)  At step three, the ALJ found that plaintiff's impairments did not meet or equal a Listing.  The ALJ specifically considered Listings 12.02, 12.04, and 12.06, finding, under the B criteria, mild restriction of activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, and pace; and one to two episodes of decompensation, each of extended duration.  (Tr. at 93.)

The ALJ then determined that plaintiff retained the RFC to perform medium work, which did not involve noisy environments or more than semi-skilled work.  (Tr. at 94.)  In making this determination, the ALJ considered plaintiff's testimony about his limitations, finding him less than credible, and the medical opinion evidence, including Dr. Halter's November 2010 report, which he afforded little weight.  (Tr. at 94-95, 97, 98.)

12

At step four, the ALJ concluded that plaintiff could perform his past relevant work as a delivery driver. The ALJ stated that the VE identified this work as light and unskilled, and testified that a person with plaintiff's RFC could do it. (Tr. at 99.) In the alternative, the ALJ concluded at step five that plaintiff could perform other jobs, including laundry worker, mail clerk, and gate attendant. (Tr. at 99.) The ALJ thus found plaintiff not disabled. (Tr. at 100.)

## D.     Appeals Council's Decision

Plaintiff requested review by the Appeals Council and submitted additional neuropsychological testing completed in September 2011. (Tr. at 691-95.) The Appeals Council granted review (Tr. at 171) but then issued its own unfavorable decision (Tr. at 2). The Council adopted much of the ALJ's analysis regarding whether plaintiff was disabled. (Tr. at 4.) However, taking into account plaintiff's limitations in concentration, persistence, and pace, the Council found plaintiff further limited to a range of unskilled work, specifically, jobs that involve simple, repetitive, two to three step instructions, and that do not require a rapid pace. The Council concluded that these restrictions accounted for plaintiff's alleged memory and cognitive problems to the extent they were credible. The Council further noted that these limitations were consistent with the report of the state agency psychological reviewer, who found plaintiff capable of unskilled work with moderate restrictions in concentration, persistence, and pace. (Tr. at 5.)

The Council noted that, contrary to the ALJ's statement, the VE had testified that plaintiff's past work as a delivery driver was semi-skilled. Accordingly, the Council found that plaintiff could not return to his past work given its RFC. However, the Council found that plaintiff could perform other jobs identified by the VE, including laundry worker, mail clerk, and

13

gate attendant.  The Council thus found plaintiff not disabled.  (Tr. at 6.)[2]

## II.  DISCUSSION

Plaintiff argues that the ALJ and the Council (1) failed to properly weigh the medical evidence, (2) failed to properly evaluate his credibility, and (3) relied on flawed VE testimony. I consider each contention in turn.

### A.    Medical Evidence

#### 1.    Applicable Legal Standards

The ALJ, not the reviewing court, is tasked with weighing the evidence and choosing between conflicting medical opinions.  See Liskowitz v. Astrue, 559 F.3d 736, 742 (7th Cir. 2009).  However, the ALJ must comply with the SSA's regulations in weighing the medical evidence.  The medical opinion of a claimant's treating physician must be given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2). An opinion that does not meet the test for controlling weight must be evaluated based on a checklist of factors, including the length, nature, and extent of the treatment relationship; the frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion.  20 C.F.R. § 404.1527(c); Roddy v. Astrue, 705 F.3d 631, 637 (7th Cir. 2013); Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011).  The ALJ must offer "good reasons" for discounting a treating source opinion.  20 C.F.R. § 404.1527(c)(2); Scott, 647 F.3d at 739.

---

[2]The Council discussed the additional cognitive testing plaintiff had submitted but noted that it post-dated the relevant period by five months, and nothing connected it to the period at issue.  (Tr. at 6 n.1.)

14

However, this preference for the treating source does not require the ALJ to find disability whenever the claimant's doctor says he cannot work.  See Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996).  The Commissioner, not a doctor selected by a patient to treat him, ultimately decides whether a claimant is disabled.  Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001).  The ALJ may, for instance, conclude that a treating source opinion is unreliable because it is based on sympathy for a patient.  See Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008).  The ALJ must also consider any record opinions from state agency medical and psychological consultants, as they "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  SSR 96-6p.  The claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore a consulting physician's opinion might have the advantages of both impartiality and expertise.  Dixon, 270 F.3d at 1177.  Ultimately, the ALJ may give less weight to a treating doctor's opinion if it is inconsistent with the opinion of a consulting physician, based solely on the patient's subjective complaints, or lacks support in the treatment record, so long as he sufficiently articulates his reasoning.  See, e.g., Ketelboeter, 550 F.3d at 625; Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007); Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004); Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).

### 2.    Analysis

Plaintiff argues that the ALJ erred in his evaluation of Dr. Halter's opinion.  I cannot agree.  The ALJ provided a thorough summary of Dr. Halter's opinion, discussing the length of her treatment relationship with plaintiff, her diagnoses and identified symptoms, the treatment and medications prescribed, and her opinions on plaintiff's functional limitations.  (Tr.

at 96-97.)  Based on the overall objective evidence of record, however, the ALJ afforded Dr. Halter's opinions and conclusions little weight.  (Tr. at 98.)

First, the ALJ noted the lack of objective findings supporting the severe limitations in Dr. Halter's report.  (Tr. at 98.)  Plaintiff counters that Dr. Halter cited the CT scan showing a large epidural hematoma and skull fracture.  However, as the ALJ noted, that CT scan was taken in October 2009 immediately after plaintiff's injury; a follow up CT scan in November 2009 showed no blood.  (Tr. at 95.)  The October 2009 CT scan is evidence of the original injury, not plaintiff's condition a year later.

Second, the ALJ noted that, contrary to Dr. Halter's statement of impaired balance and blurry vision, recent testing revealed no problems with balance and that vision had been corrected by new glasses.  (Tr. at 98.)  Plaintiff concedes that his balance and vision improved but notes that Dr. Halter also identified ongoing symptoms of fatigue and headaches. However, Dr. Halter provided no support for her estimate of plaintiff's fatigue, which the treatment note suggests she derived from plaintiff's subjective statements,[3] and the ALJ noted that recent records from Dr. Garza indicated that plaintiff's headaches were essentially being addressed with medication management.  (Tr. at 98.)

Third, the ALJ found Dr. Halter's opinions regarding plaintiff's cognitive limitations and inability to cope with stress contrary to the neuropsychological evaluation performed by Dr. Dunaway in May 2010.  (Tr. at 98.)  As the ALJ discussed in detail, Dr. Dunaway concluded that plaintiff had made a full cognitive recovery and could return to full-time gainful employment.

---

[3]As plaintiff notes in reply, a physician may consider her patient's subjective complaints. In this case, however, the ALJ found plaintiff's statements less than credible, and the ALJ may reasonably discount a report based on such subjective complaints.  See, e.g., Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).

16

Dr. Dunaway also noted that plaintiff may have been exaggerating or feigning symptoms for the purpose of internal or external secondary gains.  (Tr. at 97.)  Plaintiff contends that Dr. Halter explained that plaintiff could not tolerate even low stress work due to depression and problems dealing with stress, not because of ongoing cognitive limitations as the ALJ believed.  However, Dr. Halter's report does say that.  In any event, the ALJ reasonably relied on Dr. Dunaway's conclusion that plaintiff displayed adequate cognitive, behavioral, and emotional stability at the time of the May 2010 evaluation.  (Tr. at 98.)  The ALJ further noted that plaintiff obtained good results with medication management of his PTSD and depression.  (Tr. at 96.)

Plaintiff contends that the ALJ also erred in basing his findings regarding physical limitations entirely on the non-examining state agency consultant.  It is true that the contradictory opinion of a non-examining physician does not, by itself, suffice to reject a treating source report, Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003), but that is not what the ALJ did here.  The ALJ thoroughly discussed the entire medical treatment record, including plaintiff's relatively normal physical exams, the minimal findings on x-rays, the conservative treatment recommended, and the reported improvements with physical therapy and medication management.  The ALJ further noted that one of plaintiff's providers suggested that plaintiff also exaggerated his physical limitations, demonstrating give-way and collapsing weakness in every movement on testing.  (Tr. at 96, 98.)  Only after reviewing the entire record, including the treatment notes, did the ALJ largely concur with the state agency reviewer.  (Tr. at 98.)

Plaintiff contends that Dr. Halter's opinions are uncontradicted by other substantial evidence, but that is simply not the case.  As the ALJ noted, Dr. Dunaway, who evaluated plaintiff immediately after his injury in October 2009, again in February 2010, and for a third and

17

final time in May 2010, concluded that plaintiff made a full recovery from his traumatic brain injury, could return to full-time work, and may have been feigning continued symptoms.

Finally, plaintiff contends that, even if Dr. Halter's report did not meet the test for controlling weight, the ALJ failed to properly weigh it under the regulatory factors.  The ALJ noted that Dr. Halter had treated plaintiff for over a year and thus would be familiar with his condition.  However, the ALJ also discussed the evidence from other treating professionals, which undercut Dr. Halter's severe limitations.  The ALJ further discussed the lack of support for Dr. Halter's opinions in the objective medical evidence and the inconsistency of Dr. Halter's opinions with the overall record.  The ALJ appropriately relied on the opinion of plaintiff's examining neuropsychologist regarding his cognitive abilities, rather than that of Dr. Halter, a physical medicine specialist.

## B.   Credibility

### 1.   Applicable Legal Standards

As with the weighing of medical opinions, a reviewing court must defer to the ALJ's reasoned assessment of the claimant's credibility.  Again, though, the manner in which the ALJ evaluates credibility is highly regulated.  See, e.g., Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1027 (E.D. Wis. 2004).

The regulations set forth a two-step process for evaluating the credibility of a claimant's statements regarding pain or other symptoms.  20 C.F.R. § 404.1529(c); SSR 96-7p.  First, the ALJ must determine whether the claimant has a medically determinable physical or mental impairment that could reasonably be expected to produce his symptoms.  If he does not, the symptoms cannot be found to affect his ability to perform basic work activities.  SSR 96-7p.

Second, if the claimant has such an impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit his ability to perform basic work activities.  If the claimant's statements are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of his statements based on the entire case record, considering, in addition to the medical evidence, the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, received for relief of symptoms; any measures other than treatment used to relieve the symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to the symptoms.  SSR 96-7p; 20 C.F.R. § 404.1529(c).

### 2.    Analysis

As plaintiff notes, the ALJ inserted the SSA's "template" credibility determination into his decision, stating that while plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Tr. at 94-95.)  This "meaningless boilerplate" is unhelpful because it does not address the claimant's specific statements in light of the record and backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility.  Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012).  However, the ALJ went on to provide a specific determination in this case, finding plaintiff less than credible based on a review of the entire record.  See Filus, 694 F.3d at 868 ("If the ALJ has otherwise explained his conclusion adequately, the inclusion of this

19

language can be harmless.").

First, the ALJ noted that while plaintiff sustained significant cognitive deficits following his October 2009 injury, testing in March 2010 reflected gains in most areas and, following additional therapy, the May 2010 evaluation showed full cognitive recovery.  The May 2010 evaluation further suggested that plaintiff intentionally exaggerated or feigned symptoms for the purpose of internal or external secondary gains.  At the hearing, plaintiff denied that this was his intent, but the ALJ nevertheless found that this raised serious questions about plaintiff's credibility.  The ALJ also noted that the May 2010 test results undercut plaintiff's claims of memory and other cognitive problems.  (Tr. at 97.)  The ALJ accepted that plaintiff remained sensitive to noise, limiting him accordingly, but noted that testing revealed no deficits in attention and concentration.  (Tr. at 97-98.)  Plaintiff complained of ongoing problems with headaches, but the ALJ noted that Dr. Garza's records showed that these were addressed with medication management, and plaintiff did not require frequent or emergency treatment for them.  (Tr. at 98.)  Overall, and contrary to plaintiff's claims of continuing cognitive problems, the ALJ noted that the evidence showed that plaintiff had returned to his pre-injury psychological status.  (Tr. at 98.)

Second, regarding plaintiff's complaints of physical problems, the ALJ noted that the medical records revealed little evidence of abnormality on examination, aside from some tenderness on palpation of the lumbar spine.  His pain was essentially addressed with conservative measures, including medication and physical therapy, with noted improvement. Further, the ALJ noted that one of plaintiff's providers suggested that plaintiff also exaggerated his physical problems, demonstrating give-way and collapsing weakness in every movement on testing.  (Tr. at 98.)

20

Plaintiff concedes his cognitive improvement and generally normal physical examinations, but argues that this is not particularly relevant given the other symptoms identified by Dr. Halter.  However, the ALJ would have been remiss not to discuss this important evidence, as it directly contradicted some of plaintiff's statements and reasonably cast doubt on the credibility of his claims.  The ALJ must in evaluating credibility consider the entire record.

Plaintiff argues that his headaches were not, in fact, controlled by the medication, as he continued to seek treatment, including at the Mayo Clinic.  However, the ALJ said that plaintiff's headaches were managed not that they had resolved.  Substantial evidence supports that conclusion.  (Tr. at 95, 362.)

Finally, plaintiff contends that the ALJ mis-characterized the evidence of symptom exaggeration.  He contends that, at best, the evidence was inconclusive regarding whether he was malingering.  But the ALJ quoted extensively from the May 2010 evaluation, including its statement that plaintiff's "performance pattern on memory measures was suggestive of knowing attempts to inflate his error rate in an effort to appear more cognitively compromised that he truly was."  (Tr. at 95, 465.)  It was not "patently wrong" for the ALJ to note this as a strike against plaintiff's credibility.  Plaintiff contends that Dr. Dunaway stated that overall the findings on psychological tests were not significant enough to find that the testing was invalid.  Dr. Dunaway actually stated: "Since the remainder of his performance appears valid, those measures on which his intention was questionable were eliminated from diagnostic consideration."  (Tr. at 465.)

Plaintiff contends that the testing he submitted to the Appeals Council called into question the validity of the earlier testing suggesting malingering.  As the Council noted, the

later testing was actually mixed.  (Tr. at 5-6 n.1)  Plaintiff's score on the Rey Memory test did not indicate active malingering (Tr. at 694), and on the PAI test his responses did not suggest an attempt to exaggerate his symptoms (Tr. at 695).  However, on "the test of memory and malingering, his score on trial B of four errors [was] significantly more equivocal with a higher than 50% probability of active test distortion."  (Tr. at 694.)  Plaintiff argues that the Council failed to address the later test's suggestion of a conversion disorder or somatization disorder. The Council noted the reviewer's diagnostic impression of either a somatoform disorder or rule out new, underlying neurological disorder.  (Tr. at 5 n.1; 695.)  However, the Council found that "nothing connects this evidence, conducted five months after the period at issue, to the period at issue."  (Tr. at 6 n.1.)  Plaintiff does not challenge this determination.  Nor does he explain how the results of later testing, in which he may not have exaggerated his symptoms, undercut the ALJ's reliance on previous testing, in which he apparently did.[4]

## C.   VE Testimony

### 1.   Applicable Legal Standards

The Commissioner may rely on VE testimony in determining the availability of other jobs the claimant can perform.  See Liskowitz, 559 F.3d at 743.  However, such reliance is proper only if the ALJ, in his hypothetical questions, oriented the VE to the totality of the claimant's limitations, including any deficiencies in concentration, persistence, and pace.  See, e.g., O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010); Stewart v. Astrue, 561 F.3d

---

[4]Plaintiff argues that his good work history prior to the injury entitles him to substantial credibility.  However, the ALJ need not discuss every piece of evidence in the record, see, e.g., Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010), and none of the cases plaintiff cites holds that a claimant with a solid earnings history must be believed, regardless of the other evidence.

679, 684 (7th Cir. 2009).   Ordinarily, the ALJ "should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." O'Connor-Spinner, 627 F.3d at 620-21.   However, there is no "per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases." Id. at 619.   It is permissible for an ALJ to use "alternative phrasing specifically exclud[ing] those tasks that someone with the claimant's limitations would be unable to perform." Id.

### 2.    Analysis

As discussed above, the Appeals Council modified the ALJ's decision on this point.   The ALJ adopted an RFC for medium, semi-skilled work in a non-noisy environment.   (Tr. at 94.) However, as the Council noted, the ALJ also found moderate limitations in concentration, persistence, and pace.   (Tr. at 5.)   In order to account for this limitation, the Council adopted a more restrictive RFC – unskilled work, limited to jobs that involve simple, repetitive, two to three step instructions and that do not require a rapid pace.   (Tr. at 5.)   The Council noted that this RFC comported with the assessment of the state agency medical reviewer.   (Tr. at 5.) Based on the testimony of the VE, this modified RFC precluded plaintiff's past work.   However, the VE identified other jobs plaintiff could do, including laundry worker, mail clerk, and gate attendant.   (Tr. at 6.)

Plaintiff first argues that the Council's RFC failed to account for Dr. Halter's opinions regarding absences, additional breaks, and distraction due to pain, any one of which, the VE said, would preclude work.   As discussed above, however, the ALJ reasonably discounted Dr. Halter's opinion, and the ALJ must incorporate into his hypotheticals only those impairments

and limitations that he accepts as credible.  Simila v. Astrue, 573 F.3d 503, 521 (7th Cir. 2009).

Plaintiff also argues that the Council erred in accepting a hypothetical that did not directly incorporate limitations in concentration, persistence, and pace.  As also indicated above, however, there is no requirement that the ALJ use those exact words.  Here, the ALJ used alternate phrasing, limiting plaintiff to unskilled, simple, repetitive, two to three step tasks, that do not require a rapid pace.  (Tr. at 52.)  This is not a case like Stewart or O'Connor-Spinner, where the ALJ purported to account for moderate limitations in concentration, persistence, and pace by limiting the claimant to simple, routine, repetitive work.  As the Seventh Circuit explained in O'Connor-Spinner, "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." O'Connor-Spinner, 627 F.3d at 620.  Here, the hypothetical in this case also limited plaintiff to a non-noisy environment and to tasks not requiring a rapid pace.  Courts in this circuit have distinguished O'Connor-Spinner where the ALJ accounted for limitations in concentration, persistence, and pace by imposing similar restrictions on production or pace, or otherwise accounted for the claimant's distractability.  See Zoephel v. Astrue, No. 12-C-726, 2013 WL 412608, at *11 (E.D. Wis. Feb. 1, 2013) (collecting cases); see also Seamon v. Astrue, 364 Fed. Appx. 243, 248 (7th Cir. 2010) ("The ALJ accounted for Seamon's . . . moderate limitation in concentration, persistence, and pace when he included a restriction of 'no high production goals.'").[5]

---

[5]Plaintiff contends that the hypothetical also failed to account for episodes of decompensation.  However, the evidence supported just one such episode of extended duration, and plaintiff fails to explain what more the ALJ or the Council should have done in this regard.

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 1st day of July, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge